United States District Court
Southern District of Texas

**ENTERED**

June 01, 2022

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MT. HAWLEY INSURANCE COMPANY, §
§
     Plaintiff, §
§
VS. § CIVIL ACTION NO. 4:20-CV-2540
§
J2 RESOURCES LLC, §
§
     Defendant. §
§

## MEMORANDUM OPINION AND ORDER

This is an insurance coverage dispute involving a commercial general liability policy. The policyholder, J2 Resources LLC ("J2"), was sued in a different proceeding by two of its customers, Wood River Pipe Line LLC and Buckeye Partners, L.P. (collectively "Buckeye"). That lawsuit has settled. In this lawsuit, J2's insurance carrier, Mt. Hawley Insurance Company ("Mt. Hawley"), seeks a declaration that it need not pay J2's defense costs or indemnify J2 in Buckeye's lawsuit against J2. In a countersuit, J2 seeks a declaration that Mt. Hawley owes it defense costs and indemnity and also brings claims against Mt. Hawley for breach of contract, violations of the Texas Insurance Code ("the Insurance Code"), and violations of the Texas Deceptive Trade Practices Act ("the DTPA").

Pending before the Court is Mt. Hawley's motion for judgment on the pleadings or, in the alternative, motion for summary judgment. (Dkt. 27). Mt. Hawley's motion is construed as a motion for summary judgment and is **GRANTED**.

## I.   <u>BACKGROUND</u>

J2, which sells industrial pipe joints, valves, and fittings, bought four commercial general liability policies from Mt. Hawley. (Dkt. 17 at pp. 4–5; Dkt. 30-1 at p. 2). Together, the four policies provided primary coverage and excess coverage for the two-year period between January 15, 2019 and January 15, 2021. (Dkt. 17 at pp. 4–5). The primary and excess policies covering the period from January 15, 2020 to January 15, 2021 contained a choice-of-law provision stating that New York law governs disputes arising from those policies. (Dkt. 17-3 at p. 15; Dkt. 17-5 at p. 43). The other two policies, which covered the period from January 15, 2019 to January 15, 2020, did not contain that provision.

As is typical, the excess policies only covered losses that fell within the coverage of the primary policies. (Dkt. 17-4 at p. 5; Dkt. 17-5 at p. 6). Since the same coverage language applies to all of the policies, the Court will discuss them collectively as "the policy" or "J2's policy."

### a.  The relevant language of the policy

The policy provides that Mt. Hawley:

> will pay those sums that [J2] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. [Mt. Hawley] will have the right and duty to defend [J2] against any "suit" seeking those damages. However, [Mt. Hawley] will have no duty to defend [J2] against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
> Dkt. 17-2 at p. 16.

The policy defines "property damage" as:

a.  Physical injury to tangible property, including all resulting loss of use of that property . . . ; or

b.  Loss of use of tangible property that is not physically injured.
Dkt. 17-2 at p. 30.

The policy contains two pertinent coverage exclusions. The first exclusion (the "your product" exclusion) reads:

This insurance does not apply to . . . "[p]roperty damage" to "your product" arising out of it or any part of it.
Dkt. 17-2 at pp. 17, 20.

The policy defines "your product" quite expansively:

"Your product":

a.  Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b.  Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.
Dkt. 17-2 at p. 31.

The second relevant coverage exclusion (the "impaired property" exclusion) reads:

> This insurance does not apply to . . . "[p]roperty damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.
> Dkt. 17-2 at pp. 17, 20.

The policy defines "impaired property" as:

> tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b. You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.
> Dkt. 17-2 at p. 28.

**b. Buckeye's lawsuit**

In 2020, Buckeye initiated an arbitration proceeding against J2 and then filed a lawsuit in Texas state court against J2 and two other defendants. (Dkt. 17-1; Dkt. 19-1). Buckeye's allegations against J2 were identical in the two proceedings, so the Court will refer to the proceedings collectively as one lawsuit.[1] (Dkt. 17-1; Dkt. 19-1).

---

[1] The policy's definition of "suit" includes arbitration proceedings as well as civil lawsuits. (Dkt. 17-2 at p. 31).

In its lawsuit, Buckeye alleged that J2 sold it defective pipe, and Buckeye brought claims against J2 for breach of contract, breach of express warranty, and breach of implied warranty of merchantability. (Dkt. 19-1 at pp. 7–9). According to its pleadings, Buckeye owns the Wood River L-160 pipeline ("the pipeline"), a portion of which runs through Illinois adjacent to Interstate 294. (Dkt. 19-1 at p. 3). When state officials decided to widen part of I-294, they asked Buckeye to relocate the pipeline. (Dkt. 19-1 at p. 3). J2 contracted with Buckeye to supply "over 6,000 linear feet of pipe" for Buckeye's relocation project. (Dkt. 19-1 at pp. 3–5). To fill Buckeye's order, J2 turned to a subcontractor, American Piping Products, Inc. ("APP"), which itself turned to a subcontractor, MCIP Industrial Enterprises Corporation ("MCIP"). (Dkt. 19-1 at p. 5). APP imported raw pipe from a Romanian mill, and MCIP coated the pipe with a particular epoxy and overcoat that Buckeye required. (Dkt. 19-1 at pp. 3–5). J2 delivered the coated pipe to Buckeye, and Buckeye installed the pipe. (Dkt. 19-1 at p. 5).

Buckeye alleged in its lawsuit that the pipe provided by J2 was defective. (Dkt. 19-1 at pp. 5–6). According to Buckeye, the pipe "exhibited extensive chipping and coating failure[,]" and "[t]he coating was not adhering to the pipe and also failing in flexibility." (Dkt. 19-1 at p. 5). An investigation conducted by Buckeye, J2, MCIP, and a consulting company retained by Buckeye confirmed "that the coating was not adhering to the pipe and that the pipe failed the flexibility test." (Dkt. 19-1 at p. 6). Buckeye then determined that it needed to "remove all the pipe sold by J2, replace that pipe, and reinstall new pipe to complete the [relocation] Project." (Dkt. 19-1 at p. 6).

J2 refused to pay for the removal and replacement of the defective pipe, so Buckeye sued J2, APP, and MCIP to recover "the original purchase price and costs associated with the inspection, investigation, removal, replacement, and reinstallation of pipe to complete the [relocation] Project." (Dkt. 19-1 at pp. 7–9). Buckeye's pleadings alleged that the pipe was defective because of "a manufacturing defect that existed prior to [the] pipe being delivered to Buckeye for the [relocation] Project." (Dkt. 19-1 at pp. 5–6). Buckeye's pleadings did not allege that the pipe was damaged after it was installed or that the defective pipe caused damage to any other property. Moreover, Buckeye's pleadings did not seek damages for loss of use of the pipeline.

Buckeye's lawsuit against J2 has settled. (Dkt. 27 at p. 8; Dkt. 30 at p. 31).

### c.   This lawsuit

In this lawsuit, Mt. Hawley seeks a declaration that it need not defend or indemnify J2 in Buckeye's lawsuit against J2. (Dkt. 17 at p. 18). In its countersuit against Mt. Hawley, J2 seeks a declaration that Mt. Hawley owes it defense and indemnity in Buckeye's lawsuit against it and also seeks to hold Mt. Hawley liable for breach of contract, violations of the Insurance Code, and violations of the DTPA. (Dkt. 19 at pp. 8–18).

In addition to alleging that the policy requires Mt. Hawley to defend and indemnify it, J2 alleges that Mt. Hawley misrepresented the terms of the policy to J2 when J2 bought the policy (Dkt. 19 at pp. 17–18). J2's President and co-founder, Joseph Dugan ("Dugan"), has testified by affidavit that, when J2 bought the policy, "the broker for Mt. Hawley" told him "that the policy covered J2 Resources' core business operations including, but not limited to, the brokering, purchase and sale of pipe joints, valves, and fittings and any

lawsuits that may arise from J2 Resources' business operations." (Dkt. 30-1 at p. 2). Dugan further testified in his affidavit that the broker told him that the policy "cover[ed] the products J2 Resources sold and the projects that would incorporate [J2's] products." (Dkt. 30-1 at p. 2).

Mt. Hawley has filed a dispositive motion, which it has characterized as a "Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c) or, in the alternative, Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56[.]" (Dkt. 27 at p. 7). J2 has attached Dugan's affidavit to its response on Mt. Hawley's motion, so the Court will construe Mt. Hawley's motion as a motion for summary judgment.

## II.   <u>SUMMARY JUDGMENTS</u>

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id*. at 322–23.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The

movant, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co*., 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co*., 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only when both parties have submitted evidence of contradictory facts." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (citation and quotation marks omitted). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the non-movant must present specific facts

which show the existence of a genuine issue concerning every essential component of its case. *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). And Rule 56 does not impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment; evidence not referred to in the response to the motion for summary judgment is not properly before the Court, even if it exists in the summary judgment record. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

### III.   <u>THE COVERAGE DISPUTE</u>

Mt. Hawley is entitled to summary judgment in the insurance coverage dispute. The allegations in Buckeye's lawsuit against J2 did not involve "property damage" as defined by the policy, and the "your product" and "impaired property" coverage exclusions both applied to the facts pled by Buckeye. Accordingly, Mt. Hawley did not have a duty to defend J2 against Buckeye's lawsuit before the lawsuit settled. Moreover, there is no evidence in the record establishing that Mt. Hawley has a duty to indemnify J2.

### a.  Choice of law

The parties' summary judgment briefing outlines both Texas law and New York law because the primary and excess policies covering the period from January 15, 2020 to January 15, 2021 state that New York law governs disputes arising from those policies, while the primary and excess policies covering the period from January 15, 2019 to January 15, 2020 do not contain such a choice-of-law provision. (Dkt. 30 at pp. 12–15; Dkt. 31 at

pp. 7–9). The Court sees no conflict between Texas law and New York law that would bear on the determination of whether Mt. Hawley owed J2 a defense or owes it indemnity. "Texas courts, like those in New York, generally determine the duty to defend based on only the allegations in the underlying suit against the insured[.]" *Employers Insurance Co. of Wausau v. Harleysville Preferred Insurance Co.*, 726 Fed. App'x 56, 60–63 (2d Cir. 2018) (comparing New York insurance law to Texas insurance law).

Mt. Hawley contends that Texas law applies here because Texas is the forum state and there is no material difference between Texas insurance law and New York insurance law. (Dkt. 31 at pp. 7–9). J2 does not contest Mt. Hawley's assessment that the two bodies of law are similar; notably, J2 cites only one New York case (*Ogden Corp. v. Travelers Indemnity Co.*, 681 F. Supp. 169 (S.D.N.Y. 1988)) in the argument section of its briefing and does so to argue that New York law is consistent with Texas law regarding the loss of use of undamaged property in the context of an insurer's duty to defend its policyholder. (Dkt. 30 at pp. 20, 21). The Court finds that, despite their mentions of New York law, the parties have relied on Texas law to make their respective arguments and that no manifest injustice will result if Texas law is applied here. Accordingly, to avoid confusion and duplication of effort, the Court will apply Texas law and will not discuss New York law. *See J&D Aircraft Sales, LLC v. Continental Insurance Co.*, No. 3:03-CV-7, 2004 WL 2389445, at *5 (N.D. Tex. Oct. 26, 2004) ("Because the parties appear to agree that Texas law should apply, and because there is no showing that manifest injustice would otherwise result, the Court will apply Texas law to the issues presented in the parties' summary judgment papers."); *see also Schneider National Transport v. Ford Motor Co.*, 280 F.3d

532, 536 (5th Cir. 2002) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary. Thus, the law of the forum state, Texas, should apply here as there is no conflict between the substantive state law of Texas and Pennsylvania as each requires that insurance contracts, like other contracts, be interpreted according to their plain meaning.") (citations and quotation marks omitted).

### b. The duty to defend

Under Texas law, insurance policies are construed in accordance with the same rules as contracts generally. *Canutillo Independent School Dist. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 99 F.3d 695, 700 (5th Cir. 1996). A court's primary concern in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Federal Insurance Co. v. Northfield Insurance Co.*, 837 F.3d 548, 552 (5th Cir. 2016). In determining whether an insurer has a duty to defend an insured against a third-party complaint, Texas courts follow the "eight corners" rule. *Canutillo*, 99 F.3d at 701. The eight corners rule determines whether the insurer has a duty to defend by comparing the allegations in the third party's pleadings with the language of the insurance policy. *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). "If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured." *Id.*[2] When applying the eight corners rule, "the court must focus on the factual allegations

---

[2] The Texas Supreme Court recently reaffirmed that, "in most cases, whether a duty to defend exists is determined under Texas's longstanding eight-corners rule." *Monroe Guaranty Insurance Co. v. BITCO General Insurance Corp.*, 640 S.W.3d 195, 204 (Tex. 2022). The Texas Supreme Court added, however, that:

that show the origin of the damages rather than on the legal theories alleged." *Id*. (quotation marks omitted).

The insured bears the initial burden of showing that the claim against it is potentially within the insurance policy's scope of coverage. *Federal Insurance*, 837 F.3d at 552. If the insurer relies on a coverage exclusion to deny that it has a duty to defend, it bears the burden of proving the applicability of the exclusion. *Id*. at 552–53. Once the insurer proves that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion. *Federated Mutual Insurance Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 723 (5th Cir. 1999). If there is doubt as to whether a third party's allegations against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in the insured's favor. *Federal Insurance*, 837 F.3d at 552. Similarly, coverage exclusions are construed narrowly, and any ambiguities are resolved in the insured's favor. *Id*. at 553.

---

if the underlying petition states a claim that could trigger the duty to defend, and the application of the eight-corners rule, due to a gap in the plaintiff's pleading, is not determinative of coverage, Texas law permits consideration of extrinsic evidence provided the evidence (1) goes solely to an issue of coverage and does not overlap with the merits of liability, (2) does not contradict facts alleged in the pleading, and (3) conclusively establishes the coverage fact to be proved.
*Id*.

Here, the Court will simply apply the longstanding eight corners rule, for two reasons: (1) Buckeye's lawsuit does not state any claim that could trigger the duty to defend; and (2) there is no extrinsic evidence in the summary judgment record that meets the standard articulated by the Texas Supreme Court in *Monroe*.

i.    *The definition of "property damage"*

In arguing that it had no duty to defend J2, Mt. Hawley first contends that Buckeye's lawsuit against J2 did not involve property damage as the policy defines that term. The Court agrees.

The policy defines "property damage" as:

> a.  Physical injury to tangible property, including all resulting loss of use of that property . . . ; or
>
> b.  Loss of use of tangible property that is not physically injured.
> Dkt. 17-2 at p. 30.

Under a standard commercial general liability policy like the one here, "physical injury requires tangible, manifest harm and does not result merely upon the installation of a defective component in a product or system." *U.S. Metals, Inc. v. Liberty Mutual Group, Inc.*, 490 S.W.3d 20, 27 (Tex. 2015) (answering certified questions from the Fifth Circuit).

The Court sees no allegations in Buckeye's lawsuit that fall within this definition. There was no allegation of either physical injury to tangible property or loss of use of tangible property that was not physically injured. Buckeye's pleadings alleged that the pipe sold by J2 was defective because of "a manufacturing defect that existed prior to [the] pipe being delivered to Buckeye for the [relocation] Project." (Dkt. 19-1 at pp. 5–6). Buckeye's pleadings did not allege that the pipe was damaged after it was installed or that the defective pipe caused damage to any other property. Buckeye's pleadings did not allege that J2's defective pipe caused Buckeye to lose use of the pipeline. Moreover, Buckeye's pleadings did not seek to recover for loss of use of the pipeline or for damage to any property; instead, the relief that Buckeye sought was limited to "the original purchase price and costs

associated with the inspection, investigation, removal, replacement, and reinstallation of pipe to complete the [relocation] Project." (Dkt. 19-1 at pp. 7–9). Under these circumstances, "[a]s a matter of law, there [wa]s no duty to defend because the underlying lawsuit did not claim covered property damage." *Building Specialties, Inc. v. Liberty Mutual Fire Insurance Co.*, 712 F. Supp. 2d 628, 645 (S.D. Tex. 2010).

Generally, if a product is defective when installed, replacement of that product is not, on its own, property damage covered by a standard commercial general liability policy. *Liberty Surplus Insurance Corp. v. Century Surety Co.*, No. 4:18-CV-1444, 2019 WL 3067504, at *6–8 (S.D. Tex. July 12, 2019). Accordingly, a lawsuit will not generally allege property damage covered by a standard commercial general liability policy if it only seeks the cost of replacing a product that was defective when installed and it does not allege any physical damage or a loss of use. *Building Specialties*, 712 F. Supp. 2d at 645.

*Building Specialties* is an illustrative example. In *Building Specialties*, a heating and air conditioning company called Lone Star hired another company called Building Specialties to handle duct work for a residential construction project. *Id.* at 631. After the installation, Lone Star sued Building Specialties, alleging only that "Building Specialties 'designed and installed the heating and air conditioning duct work for the project' and that '[s]hortly after the system began operating, defects in the installation of the duct work were discovered.'" *Id.* at 632. In concluding that Lone Star's lawsuit did not allege covered property damage, Judge Rosenthal explained that:

> the amended petition in the underlying litigation alleged only that the duct work was defective and had to be replaced. There were no allegations of any resulting physical damage to the duct work itself or to other parts of the house

> or to the loss of use. The petition sought damages only for the cost of repairing the defective duct work. The petition alleged defective work by the insured but did not allege that the defective work "caused physical injury or loss of use." The petition did not allege covered "property damage."
> *Id*. at 645.

Other cases interpreting the definition of "property damage" in standard commercial general liability policies are in accord with *Building Specialties*. The caselaw makes clear that the cost of removing and replacing a defective product can give rise to damages covered by a commercial general liability policy if the defective product itself sustains damage post-installation, if the defective product causes other covered property damage, or if removing the defective product is necessary to find and repair other covered property damage. *Compare Lennar Corp. v. Markel American Insurance Co.*, 413 S.W.3d 750, 757–58 (Tex. 2013) (holding that the cost of removal of defective exterior insulation was covered when the insulation caused water damage and the damage could not be located if the insulation was not removed) *with Lennar Corp. v. Great American Insurance Co.*, 200 S.W.3d 651, 678–80 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (holding that the cost of removal of defective exterior insulation was not covered when the insulation was defective at the time of its installation, was not damaged post-installation, and did not cause water damage); *see also Crownover v. Mid-Continent Casualty Co.*, 772 F.3d 197, 206–07 (5th Cir. 2014) (distinguishing *Building Specialties* and holding that the cost of replacing heating and air conditioning units was covered when, because of improper installation of the heating and air conditioning system, the units "were satisfactory at move-in but subsequently wore out[,]" establishing a basis for concluding that post-installation loss of use resulted from the improper installation) ("[T]he plaintiff [in *Building Specialties*] failed

to allege that the defective work caused physical damage or loss of use. Here, the defective installation of the HVAC system caused the system to be deficient and eventually required the stressed mechanical units to be replaced. . . . [T]he loss of their use amounted to property damage.") (citation omitted). But none of those circumstances was raised by the pleadings in *Building Specialties*, and none was raised by Buckeye's pleadings.

In its briefing, J2 concedes that "Property Damage must be more than a defective product." (Dkt. 30 at p. 23). However, J2 argues that Buckeye's allegations necessarily implicated a "damaged pipeline and/or loss of use of that pipeline" because Buckeye's lawsuit "allege[d] that the J2 Pipe failed, rendered the pipeline inoperable and prevented completion of the [relocation] Project." (Dkt. 30 at pp. 20, 23). The Court disagrees with J2's characterization of Buckeye's pleadings. According to Buckeye's pleadings, the pipe provided by J2 did not force Buckeye to close the pipeline; the widening of I-294 did. Although Buckeye's lawsuit alleged that the pipe provided by J2 failed to meet Buckeye's specifications, it did not allege that the defects in J2's pipe damaged its pipeline or delayed the reopening of the pipeline. In fact, beyond stating that J2 provided 6,000 linear feet of pipe to Buckeye, Buckeye's pleadings gave no indication of the duration or scale of the relocation project, much less of the defective pipe's effect on the project's timeline. (Dkt. 19-1 at p. 3). The Court cannot assume that Buckeye alleged loss of use of its pipeline or damage to its pipeline when Buckeye's pleadings did not say so. *See Building Specialties*, 712 F. Supp. 2d at 645 (quoting 3 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES & INSUREDS § 11:1 (5th ed. 2010) ("[I]t is not enough that the party suing the insured has incurred property damage; the damages

being sought must be because of that property damage. And the issue is not whether the insured could be sued for such damages, but whether it *is* being sued for such damages.") (emphasis in *Building Specialties*); *see also Amerisure Mutual Insurance Co. v. Miner-Dederick Construction, L.L.P.*, No. 4:11-CV-889, 2012 WL 13055567, at *8 (S.D. Tex. July 13, 2012), *adopted*, No. 4:11-CV-889 at docket entry 53 ("The statements cited by Gulf Chemical, as those cited by Miner-Dederick in arguing that the complaint potentially alleged physical injury to other property, would require the court to go beyond interpreting facts favorable to the insured and to assume unalleged facts in order to trigger a claim potentially covered by the CGL policy."). This case, in other words, is analogous to *Building Specialties*, not to *Crownover*.

The Court agrees with Mt. Hawley that Buckeye's lawsuit against J2 did not involve property damage as the policy defines that term and that Mt. Hawley consequently had no duty to defend J2 against Buckeye's lawsuit.

### ii. The "your product" and "impaired property" coverage exclusions

The Court further agrees with Mt. Hawley that the policy's standard "your product" and "impaired property" coverage exclusions applied. The applicability of those exclusions provides another reason why Mt. Hawley had no duty to defend J2 against Buckeye's lawsuit.

The "your product" and "impaired property" coverage exclusions are commonly called "business risk" exclusions. *Dal-Tile Corp. v. Zurich American Insurance Co.*, No. 3:02-CV-751, 2004 WL 414900, at *2–3 (N.D. Tex. Feb. 2, 2004). "The purpose of a 'business risk' exclusion is to protect insurers from damages to an insured's product by his

own hand, as this is typically considered a cost of doing business." *National Union Fire Insurance Co. of Pittsburgh, P.A. v. Puget Plastics Corp.*, 450 F. Supp. 2d 682, 696 (S.D. Tex. 2006) ("*Puget I*"), *aff'd*, 532 F.3d 398 (5th Cir. 2008) ("*Puget II*").

The "your product" exclusion excludes coverage for "'[p]roperty damage' to 'your product' arising out of it or any part of it." (Dkt. 17-2 at pp. 17, 20). The definition of "your product" includes "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the policyholder, as well as any "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use" of those goods or products. (Dkt. 17-2 at p. 31). The "your product" exclusion excludes coverage for damages to the insured's defective product, as well as for the costs to repair or replace the insured's defective product, if those damages or costs arise out of the defective product itself. *Dal-Tile*, 2004 WL 414900 at *5 ("A liability policy containing [a 'your product' exclusion] does not insure the policyholder against liability for the repair or replacement of his own defective work product, but it does provide coverage for the insured's liability for damages to other property resulting from the defective condition of the work even though the injury to the work product itself is excluded.").

The "impaired property" exclusion reads:

> This insurance does not apply to . . . "[p]roperty damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (3) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(4) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.
Dkt. 17-2 at pp. 17, 20.

The policy defines "impaired property" as:

tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b.  You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.
Dkt. 17-2 at p. 28.

The "impaired property" exclusion excludes coverage for "damage to third-party property that incorporates the insured's product when the third-party property is functional upon repairing or replacing the insured's product." *Puget II*, 532 F.3d at 403. The "impaired property" exclusion also excludes coverage for "damages to property, or for the loss of its use, if the property was not physically injured" and the damages or loss of use arose out of the insured's defective product. *U.S. Metals*, 490 S.W.3d at 22.

Here, taken together, the "your product" and "impaired property" exclusions establish that Mt. Hawley had no duty to defend J2 against Buckeye's lawsuit. Buckeye's lawsuit alleged that J2 supplied defective pipe and breached its warranties and representations regarding the quality and fitness of the pipe. Buckeye's claims to recover

"the original purchase price and costs associated with the inspection, investigation, removal, replacement, and reinstallation" of the defective pipe fell within the plain language of the "your product" exclusion. (Dkt. 19-1 at pp. 7–9). Moreover, Buckeye's lawsuit did not allege physical injury to its pipeline, so the "impaired property" exclusion precluded coverage for any damage to the pipeline, including for loss of use of the pipeline, because that damage arose out of J2's defective pipe.

Even if Buckeye's lawsuit could be construed as having alleged physical injury to its pipeline, the "your product" and "impaired property" coverage exclusions both still applied to the facts pled by Buckeye. *Puget I*, 450 F. Supp. 2d at 696–97, 702. The *Puget* litigation involved the application of both exclusions under circumstances that are instructive here. In *Puget*, the policyholder, Puget, manufactured plastic water chambers that were a component part of tankless water heaters manufactured by a different company, Microtherm. *Id*. at 685. When the plastic water chambers began to fail, Microtherm successfully sued Puget. *Id*. Puget's umbrella carrier filed a coverage lawsuit seeking a declaration that it did not have a duty to pay the defense costs and damages resulting from Microtherm's lawsuit against Puget. *Id*. Puget's policy contained "your product" and "impaired property" exclusions identical to those contained in J2's policy. *Id*. at 696, 701–02 & nn. 14 & 21. In ruling on cross-motions for summary judgment, Judge Hanen made three determinations relevant to this case: (1) "[D]amages to the chambers themselves, including damages arising from a breach of warranty, [we]re clearly excluded by the ['your product'] exclusion"; (2) "A water heater that could be placed back into service simply by repair or replacement of the water chambers clearly f[ell] within the definition of 'impaired

property'"; and (3) "[A] water heater that [was] damaged due to the water leakage to the point where it w[ould] not properly function by repair or replacement of the water chambers d[id] not fall within the definition of 'impaired property.'" *Id*. at 696–97, 702.

Under the facts as pled by Buckeye and the plain language of the policy, the water chambers in *Puget* are analogous to J2's defective pipe. Accordingly, under the "your product" exclusion in the policy, property damage to J2's pipe was excluded from coverage. *See id.* at 696–97. Furthermore, the water heaters in *Puget* that could be placed back into service simply by way of repair or replacement of the water chambers are analogous to the pipeline. *See id.* at 702. Buckeye did not allege that J2's defective pipe damaged the pipeline to the point where fixing the pipeline required more than simple repair or replacement of J2's defective pipe, so there were no factual allegations that could possibly have asserted claims falling outside of the "impaired property" exclusion. *See id.*; *see also Amerisure*, 2012 WL 13055567 at *8 ([W]ithout the court's reading of unasserted facts into the complaint, the four-corners of the complaint do not lend themselves to an interpretation that Gulf Chemical sustained physical injury to other property, thus falling outside the definition of 'impaired property,' as a result of the defective joint."). Accordingly, under the "impaired property" exclusion in the policy, property damage to the pipeline was excluded from coverage.

Both the "your product" and the "impaired property" exclusions applied here, and as a result Mt. Hawley did not owe J2 a duty to defend J2 against Buckeye's lawsuit.

### c. The duty to indemnify

Furthermore, there is no evidence in the record establishing that Mt. Hawley has a duty to indemnify J2.

The duty to indemnify "arises after an insured has been adjudicated, whether by judgment or settlement, to be legally responsible for damages in a lawsuit." *Collier v. Allstate County Mutual Insurance Co.*, 64 S.W.3d 54, 62 (Tex. App.—Fort Worth 2001, no pet.); *see also Reser v. State Farm Fire & Casualty Co.*, 981 S.W.2d 260, 263 (Tex. App.—San Antonio 1998, no pet.). Unlike the duty to defend, which is based on allegations, an insurer's duty to indemnify is based on "the actual facts that underlie the cause of action and result in liability." *Northfield Insurance Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528–29 (5th Cir. 2004) (quotation marks omitted). If the actual facts resulting in liability were not fully ascertained in the underlying case because the insured settled with the third party out of court, facts relevant to coverage can be proven in the coverage litigation or provided by stipulation. *In re Farmers Texas County Mutual Insurance Co*., 621 S.W.3d 261, 276 (Tex. 2021); *Canutillo*, 99 F.3d at 701; *see also, e.g., Colony Insurance Co. v. Peachtree Construction, Ltd.*, 647 F.3d 248, 254–55 (5th Cir. 2011) (reversing summary judgment for a liability carrier in coverage litigation when an additional insured on a policy offered summary judgment evidence to show that the claims in the underlying lawsuit were related to the named insured's work for the additional insured, which created the possibility that the carrier was obligated to indemnify the additional insured even though there was no duty to defend) ("In cases like this, where the underlying liability dispute is resolved before trial and there is no opportunity to develop

the facts, additional evidence—not relevant to the issue of liability but essential to coverage—may be introduced during the coverage litigation to establish or refute the duty to indemnify.").

The Texas Supreme Court has set out one circumstance under which the duty to indemnify is essentially decided by the eight-corners rule: "[T]he duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." *Farmers Texas County Mutual Insurance Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (emphasis removed). The principle articulated in *Griffin* applies if "under the facts pled by the plaintiffs [in the underlying lawsuit] it would have been impossible for the insured defendant to show by extrinsic evidence that the loss fell under the terms of the policy." *Burlington Northern and Santa Fe Railway Co. v. National Union Fire Insurance Co. of Pittsburgh, PA*, 334 S.W.3d 217, 220 (Tex. 2011).

Mt. Hawley argues that the *Griffin* principle applies here because "the allegations in [Buckeye's lawsuit] against J2 do not constitute 'property damage' within [the policy] and, in any event, the allegations fall squarely within the ["your product"] exclusion. Even if those facts are proven to be true, there would still be no coverage under [the policy]." (Dkt. 27 at p. 30). In response, J2 argues that the Texas Supreme Court has "renounc[ed] the blanket application of *Griffin*" and that "the duty to indemnify [i]s a fact question such that the insurer and the putative insured may introduce evidence in coverage litigation to establish or refute the insurer's duty to indemnify even if the court finds no duty to defend."

(Dkt. 30 at p. 28) (quotation marks and brackets omitted). J2 contends that Mt. Hawley's motion must accordingly be denied because Mt. Hawley "has not presented any evidence for the Court to review." (Dkt. 30 at p. 28).

Irrespective of whether this case falls within the scope of the *Griffin* principle, Mt. Hawley is entitled to summary judgment for the simple reason that the record contains neither stipulations nor evidence of facts showing that Mt. Hawley had a duty to indemnify J2. The Court disagrees with J2's assertion that the absence of such evidence requires that Mt. Hawley's motion be denied. To the contrary, J2 bears the burden of showing that the claims against it fell within the policy's coverage, including the burden of showing that exceptions to the "your product" and "impaired property" exclusions apply. *See Federal Insurance*, 837 F.3d at 552; *Grapevine*, 197 F.3d at 723. Consequently, J2 bore the burden in this summary proceeding to designate specific facts showing that there is a genuine issue of material fact for trial regarding the duty to indemnify. *Celotex*, 477 U.S. at 322–23.

J2 has not carried its burden. The only evidence in the summary judgment record that potentially addresses the duty to indemnify is one paragraph in the affidavit sworn out by Dugan, J2's President and co-founder. In that paragraph, Dugan asserts that he "had several conversations with Buckeye representatives" and that he "understood from these conversations with Buckeye that the issues they identified with J2 Resources' pipe product caused Buckeye to delay completing final construction and inspection of its pipeline." (Dkt. 30-1 at pp. 2–3). Dugan further testifies that he "also understood from these conversations that other components of the pipeline had to be removed, replaced or

reinstalled as a result of the alleged deficiencies in J2 Resources' pipe joints." (Dkt. 30-1 at p. 3).

Dugan's statements about the effects of J2's defective pipe on Buckeye's pipeline are not competent summary judgment evidence. The statements merely summarize Dugan's "understanding" of inadmissible hearsay statements (which are not themselves quoted in the affidavit) from unnamed declarants about matters of which Dugan has not established his own personal knowledge. Even leaving those defects aside, the statements are too vague to create a fact issue on Mt. Hawley's duty to indemnify.

As discussed above, the "your product" and "impaired property" exclusions in the policy apply under the facts pled by Buckeye. The "impaired property" exclusion excludes coverage for "damage to third-party property that incorporates the insured's product when the third-party property is functional upon repairing or replacing the insured's product." *Puget II*, 532 F.3d at 403. The "impaired property" exclusion also excludes coverage for "damages to property, or for the loss of its use, if the property was not physically injured" and the damages or loss of use arose out of the insured's defective product. *U.S. Metals*, 490 S.W.3d at 22. One way for a policyholder to escape the reach of the "impaired property" exclusion, at least to a limited degree, is to show that the repair or replacement of the policyholder's defective product caused physical injury to other component parts of the third-party property that incorporated the defective product. *Id*. at 28 ("[T]he insulation and gaskets destroyed in the process [of replacing the policyholder's defective product] were not restored to use; they were replaced. They were therefore not impaired property to which [the 'impaired property' exclusion] applied, and the cost of replacing them was

therefore covered by the policy."). "[P]hysical injury requires tangible, manifest harm and does not result merely upon the installation of a defective component in a product or system." *Id.* at 27.

Dugan's testimony about "other components of the pipeline" appears to be meant to establish that the repair or replacement of J2's pipe caused physical injury to other component parts of Buckeye's pipeline. But it is too vague to do so. Dugan—who, again, relies entirely on his "understanding" of unspecified hearsay statements made by unnamed declarants—can only testify that he understood based on conversations with Buckeye representatives that "other components of the pipeline had to be removed, replaced or reinstalled as a result of the alleged deficiencies in J2 Resources' pipe joints." (Dkt. 30-1 at pp. 2–3). Dugan's affidavit does not specify particular components of the pipeline, describe what happened to any components of the pipeline, or even assert generally that any components of the pipeline were physically injured. *Cf. id.* at 22 ("For each flange, this process involved stripping the temperature coating and insulation (which were destroyed in the process), cutting the flange out of the pipe, removing the gaskets (which were also destroyed in the process), grinding the pipe surfaces smooth for re-welding, replacing the flange and gaskets, welding the new flange to the pipes, and replacing the temperature coating and insulation."). Without such crucial details, the statements in Dugan's affidavit do not provide "specific facts" sufficient to establish that the repair or replacement of J2's pipe caused physical injury to other component parts of Buckeye's pipeline, which J2 must do in order to show that some of the money paid by J2 to Buckeye in settlement may fall within the policy's coverage. *Id.* at 28; *see also Lujan v. National Wildlife Federation*, 497

U.S. 871, 888–89 (1990) (holding that a district court examining a nonmovant's summary judgment evidence may not "assum[e] that general averments embrace the 'specific facts' needed to sustain the complaint") (quotation marks omitted) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. . . . It will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege.").

Since J2 failed to carry its burden to designate specific facts showing that Mt. Hawley had a duty to indemnify it, the Court will grant Mt. Hawley's motion for summary judgment on the duty to indemnify. *See Gemini Insurance Co. v. Tristream East Texas LLC*, No. 4:11-CV-2709, 2012 WL 13048521, at *11 (S.D. Tex. Nov. 16, 2012) ("The parties have pointed to no evidence in the record indicating that the contractual liability exclusion, which the Court has relied on in finding that Gemini had no duty to defend Tristream in the Eagle Rock suit, does not also preclude indemnification. The Court finds that Tristream has not demonstrated that any facts were developed in the underlying Eagle Rock suit that can bring that suit under the exception to the contractual liability exclusion.").

## IV.    J2'S BREACH OF CONTRACT AND EXTRACONTRACTUAL COUNTERCLAIMS

Mt. Hawley is also entitled to summary judgment on J2's breach of contract and extracontractual counterclaims. Those counterclaims can be divided into two categories: (1) claims alleging that Mt. Hawley breached the policy and violated the Insurance Code and the DTPA by refusing to defend or indemnify J2 (Dkt. 19 at pp. 15–17; Dkt. 30 at p.

29); and (2) claims alleging that Mt. Hawley violated the DTPA by misrepresenting the terms of the policy to J2 when J2 bought the policy (Dkt. 19 at pp. 17–18; Dkt. 30 at pp. 29–31).

### a. Counterclaims based on Mt. Hawley's denial of coverage

The first category of counterclaims fails because there is no evidence in the record showing that Mt. Hawley had a duty to defend J2; has a duty to indemnify J2; or, in denying J2's claim, has committed some extreme act that caused J2 to suffer an injury independent of the policy claim. Without establishing at least one of those three things, J2 cannot prevail on its counterclaims for breach of contract and violations of the Insurance Code and the DTPA that are based on Mt. Hawley's denial of coverage. *Mt. Hawley Insurance Co. v. Huser Construction Co., Inc.*, No. 4:18-CV-787, 2019 WL 1255756, at *8–9 (S.D. Tex. Mar. 19, 2019), *aff'd*, 797 Fed. App'x 183 (5th Cir. 2020); *St. Paul Fire & Marine Insurance Co. v. Riley Exploration, LLC*, No. 3:16-CV-1437, 2017 WL 3841606, at *5 (N.D. Tex. Feb. 17, 2017); *see also Republic Insurance Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995).

### b. Counterclaims based on Mt. Hawley's alleged misrepresentations

The second category of counterclaims fails because J2 has not presented sufficient evidence showing that an agent of Mt. Hawley misrepresented specific policy terms prior to a loss or that such a misrepresentation caused harm to J2. J2 alleges that Mt. Hawley violated the DTPA by misrepresenting the terms of the policy to J2 when J2 bought the policy (Dkt. 19 at pp. 17–18; Dkt. 30 at pp. 29–31). Dugan, J2's President and co-founder, has testified by affidavit that, when J2 bought the policy, "the broker for Mt. Hawley" told

him "that the policy covered J2 Resources' core business operations including, but not limited to, the brokering, purchase and sale of pipe joints, valves, and fittings and any lawsuits that may arise from J2 Resources' business operations." (Dkt. 30-1 at p. 2). Dugan further testified in his affidavit that the broker told him that the policy "cover[ed] the products J2 Resources sold and the projects that would incorporate [J2's] products." (Dkt. 30-1 at p. 2). Dugan's affidavit does not create a genuine issue of material fact on J2's claims that Mt. Hawley misrepresented the terms of the policy.

In the first instance, Dugan's affidavit is too vague to set out an actionable misrepresentation. "To make out a *prima facie* case of misrepresentation [under Texas law], an insured must show that the person making the statement was an agent of the insurance company and that the statement was false." *Performance Autoplex II Ltd. v. Mid-Continent Casualty Co.*, 322 F.3d 847, 859 (5th Cir. 2003). "[A]n insurance company may be liable for the misstatements of an agent simply because it authorized the agent to sell its policies, even if it did not authorize the agent to make the misstatements." *Id*. To be liable, however, the agent must misrepresent specific policy terms prior to a loss, and the insured's reliance upon that misrepresentation must actually cause the insured to incur damages. *Griggs v. State Farm Lloyds*, 181 F.3d 694, 701 (5th Cir. 1999). "An insurance agent's statement that a policy will protect an insured is generally an expression of opinion, and opinion alone is not sufficient to support an action for fraud or misrepresentation." *Sohmer v. American Medical Security, Inc.*, No. 3:02-CV-1680, 2002 WL 31323763, at *2 (N.D. Tex. Oct. 15, 2002); *see also Test Masters Educational Services, Inc. v. Scottsdale Insurance Co.*, No. 4:06-CV-469, 2006 WL 2331050, at *2 (S.D. Tex. Aug. 8, 2006).

The identity of the person with whom Dugan spoke is unclear, and Mt. Hawley does not concede that the person was authorized to sell its policies or act as its agent. (Dkt. 31 at p. 21). Even assuming that the person was an agent of Mt. Hawley, the statements cited by Dugan do not rise to the level of an actionable misrepresentation under the circumstances present here. Dugan testified that the person told him "that the policy covered J2 Resources' core business operations including, but not limited to, the brokering, purchase and sale of pipe joints, valves, and fittings and any lawsuits that may arise from J2 Resources' business operations." (Dkt. 30-1 at p. 2). Dugan further testified in his affidavit that the broker told him that the policy "cover[ed] the products J2 Resources sold and the projects that would incorporate [J2's] products." (Dkt. 30-1 at p. 2). These statements are more akin to general statements that J2 was covered by the policy than they are to misrepresentations of specific policy terms. Dugan does not testify that any agent of Mt. Hawley ever specifically told him that it would defend or indemnify J2 under the circumstances present here—namely, a lawsuit against J2 arising out of J2's allegedly defective product in which no physical injury to any property is alleged or proven. Accordingly, Dugan's affidavit provides no evidence of any actionable misrepresentation by Mt. Hawley. *Parkins v. Texas Farmers Insurance Co.*, 645 S.W.2d 775, 777 (Tex. 1983), *abrogated in part on other grounds*, *Metro Allied Insurance Agency, Inc. v. Lin*, 304 S.W.3d 830, 835–36 (Tex. 2009) ("Parkins nowhere shows that Farmers ever assured him of coverage against fire loss under the circumstances present here or that they would issue a particular kind of policy. This case is therefore clearly distinguishable from *Royal Globe Ins. Co. v. Bar Consultants, Inc.,* [577 S.W.2d 688 (Tex. 1979),] where it was undisputed

that the agent had expressly told the insured at the time the policy was written that he was 'totally covered' against any losses from vandalism.").

Furthermore, Dugan's affidavit does not provide any evidence to satisfy the causation element as defined by Texas caselaw interpreting the DTPA. A misrepresentation as to the scope of insurance coverage is not actionable under the DTPA if the plaintiff cannot provide proof that coverage was commercially available for the loss sustained. *Lin*, 304 S.W.3d at 836 ("Lin is required to present legally sufficient evidence that the coverage he sought is obtainable to surmount the causation hurdle."). And the misrepresentation itself does not constitute such proof. "The law is clear that misrepresentations about insurance coverage cannot, under the doctrine of estoppel, expand coverage provided in an insurance policy[,]" so a misrepresentation about insurance coverage, on its own, "is no evidence that a contract, had one existed, would actually have covered [the plaintiff's] damages." *Id*.

Here, J2 points only to the alleged misrepresentation as evidence that it could have obtained a commercial general liability policy that covered replacement and repair costs for a defective product—it has not, for instance, produced an insurance agreement available in the market that would have provided coverage for Buckeye's claims against it or presented expert testimony regarding coverage for similar claims. Evidence outside of the alleged misrepresentation itself would likely be very hard to come by, as commercial general liability policies have long excluded coverage for the replacement and repair of defective products. *Dal-Tile*, 2004 WL 414900 at *4 (quoting *T.C. Bateson Construction Co. v. Lumbermens Mutual Casualty Co.*, 784 S.W.2d 692, 695 (Tex. App.—Houston [14th

Dist.] 1989, writ denied)) ("[T]he purpose of comprehensive liability insurance coverage is to provide protection to the insured for personal injury or property damage caused by the completed product but not for the replacement and repair of that product.") (emphasis removed). Accordingly, the evidence in the record is insufficient to establish that Mt. Hawley's alleged misrepresentation caused injury to J2 under the Texas cases interpreting the DTPA. *Lin*, 304 S.W.3d at 836.[3]

J2 has not presented sufficient evidence showing that an agent of Mt. Hawley misrepresented specific policy terms prior to a loss or that such a misrepresentation caused harm to J2. J2's claims alleging that Mt. Hawley misrepresented the terms of the policy when J2 bought the policy accordingly fail.

## V.    **CONCLUSION**

Mt. Hawley's motion for judgment on the pleadings or, in the alternative, motion for summary judgment (Dkt. 27) is construed as a motion for summary judgment and is **GRANTED**.

SIGNED at Houston, Texas, on June 1, 2022.

_George C. Hanks Jr_
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE

---

[3] To the extent that J2's misrepresentation claims are brought under the Insurance Code in addition to the DTPA, *Lin* still applies. The causation standard for both Insurance Code and DTPA claims, which are often brought in tandem, is "producing cause." *Provident American Insurance Co. v. Castaneda*, 988 S.W.2d 189, 193 (Tex. 1998) (Insurance Code); *Metro Allied Insurance Agency, Inc. v. Lin*, 304 S.W.3d 830, 834 (Tex. 2009) (DTPA).